

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



INTERMOUNTAIN IRONWORKERS
TRUST FUND, Derivatively and on
Behalf of Barnes & Noble, Inc.,

          Plaintiff,

   vs.

LEONARD RIGGIO, STEPHEN RIGGIO,
MATTHEW A. BERDON, MICHAEL J.
GIUDICE, WILLIAM T. DILLARD, IRENE R.
MILLER, MARGARET T. MONACO,
MICHAEL N. ROSEN, WILLIAM SHELUCK,
JR., WILLIAM F. REILLY, MITCHELL S.
KLIPPER, MARIE J. TOULANTIS, J. ALAN
KAHN, WILLIAM F. DUFFY, JOSEPH
LOMBARDI, CHRISTOPHER GRADY-TROIA
MARY ELLEN KEATING, DAVID S. DEASON
MICHELLE SMITH, LAWRENCE S. ZILAVY,

          Defendants,

   -and-

BARNES & NOBLE, INC.,a
Delaware Corporation

          Nominal Defendant.

**JUDGE KARAS**

06 CV 6692

CIVIL ACTION NO.

RECEIVED
SEP 01 2006
U.S.D.C. S.D. N.Y.
CASHIERS

JURY TRIAL DEMANDED

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Intermountain Ironworkers Trust Fund ("Plaintiff" or "Ironworkers"), derivatively and

on behalf of Nominal Defendant Barnes & Noble, Inc. ("Barnes & Noble" or the "Company"), and

for its Verified Derivative Complaint against Defendants herein, alleges the following based upon

personal knowledge as to itself and its own acts and upon information and belief as to all other

matters, based upon, *inter alia,* the investigation conducted by and under the direction of its attorneys, which investigation included a review of press releases and other public statements made by Barnes & Noble, its officers and agents; filings by the Defendant with the United States Securities and Exchange Commission ("SEC"), and publicly available articles and information about Defendant and its management in the financial and general press and on the Internet.

## NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought by Plaintiff for the benefit of Barnes & Noble, against Defendants, who are certain members of the Company's Board of Directors (the "Board"), and certain of its executive officers and certain former directors and/or officers (collectively, "Defendants," as identified herein).  This action seeks  to recover for Barnes & Noble and its shareholders the millions of dollars of damages caused by Defendants' intentional, reckless and/or negligent violations of federal and state law, including breaches of fiduciary and professional duties, acts of bad faith, waste of corporate assets, unjust enrichment, gross mismanagement, statutory violations and other violations of law.

2.      This action arises out of a scheme and course of wrongful conduct between 1997 and 2005 whereby Defendants intentionally and unlawfully backdated or changed the date used to set the exercise price of Company stock options to a date on which the price of the stock was at a low, or otherwise manipulated the exercise price of the Company's stock options so as to cause an option to be granted at a price lower than it should have been under applicable accounting rules, including Generally Accepted Accounting Principles ("GAAP").   As a result, Defendants allowed certain directors and senior officers to divert hundreds of millions of dollars of corporate assets to themselves through the manipulation of the exercise price of hundreds of thousands of stock options

granted to Barnes & Noble insiders.  Each of the Defendants aided, abetted and otherwise participated in the concealment of the backdating scheme complained of herein and/or refused to pursue the Company's legal rights to require these insiders to disgorge the hundreds of millions of unlawfully obtained compensation and proceeds diverted to them.

3.      Throughout this scheme and course of wrongful conduct, Defendants were aware of, acquiesced in and/or participated in stock option backdating to dates when the Company's shares were trading at or near the lowest prices for the relevant period.  Further, the Defendants were aware of, acquiesced in and/or participated in the insider selling of over six (6) million shares of stock generating more than $200 million in stock sale proceeds for the Defendants.

4.      In particular, Plaintiff alleges that the Defendants committed gross breaches of their fiduciary duties as officers and/or directors of Barnes & Noble by colluding with one another to:

a.      improperly backdate grants of stock options of Defendant Barnes & Noble to Barnes & Noble officers, directors and executives, in violation of the Company's shareholder-approved stock option plans;

b.      improperly record and account for the backdated stock options, in violation of GAAP;

c.      improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Tax Code;

d.      produce and disseminate to Barnes & Noble shareholders and the market false financial statements and filings with the SEC that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

e.      sell shares of their Barnes & Noble stock while in possession of negative information about the Company, which was not generally available to the public, in violation of securities laws.

3

5.    As a result of the Defendants' misconduct, Barnes & Noble has sustained millions of dollars in damages, and the Defendants and the other recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

6.    As a further result of the Defendants' misconduct, Barnes & Noble's publicly issued financial results were materially overstated at all times.  The Company is now subject to potential liability from regulators, SEC and the Internal Revenue Service ("IRS"), and the Company and its senior executives are now exposed to criminal and civil liability for issuing false and misleading financial statements.

**JURISDICTION AND VENUE**

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  The Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one intended to confer jurisdiction on a court of the United States that the Court would not otherwise have.

8.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including all or primarily all of Defendants' participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

9.      Plaintiff Ironworkers, a citizen of the State of Utah, is and was at all relevant times a shareholder of nominal Defendant Barnes & Noble.

10.      Nominal Defendant Barnes & Noble is a Delaware corporation with its principal executive offices located at 122 Fifth Avenue, New York, NY 10011.  According to its public filings, Barnes & Noble is "the nation's largest bookseller."  Its principal business is the sale of trade books, mass market paperbacks, children's books, bargain books, magazines, music and movies direct to customers, which collectively account for substantially all of the Company's sales.

11.      Defendant Leonard Riggio ("Leonard Riggio") is founder of the Company and Chairman of the Board.  He has served on the Board since 1986.  Based on his knowledge of material, non-public information regarding the Company, Leonard Riggio violated securities laws by selling more than 900,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $26 million.

12.      Defendant Stephen Riggio ("Stephen Riggio") is Vice Chairman of the Board and the Company's chief executive officer.  He has been a member of the Board since 1997.  Based on his knowledge of material, non-public information regarding the Company, Stephen Riggio violated securities laws by selling more than 1.8 million shares of Barnes & Noble stock, generating insider selling proceeds of more than $47 million.

13.      Defendant Matthew A. Berdon ("Berdon") has been a director since 1992.  He has served on the Compensation and Audit Committees of the Board since at least 1998.  Based on his knowledge of material, non-public information regarding the Company, Berdon violated securities

laws by selling more than 36,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $1.3 million.

14.     Defendant Michael J. Del Giudice ("Del Giudice") has been a director of the Company since 1999.  He has served on the Board's Audit Committee since at least 1998.  Based on his knowledge of material, non-public information regarding the Company, Del Giudice violated securities laws by selling more than 29,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $926,000.

15.     Defendant William T. Dillard, II ("Dillard") has been a director of the Company since 1993.  Based on his knowledge of material, non-public information regarding the Company, Dillard violated securities laws by selling more than 84,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $3.1 million.

16.     Defendant Irene R. Miller ("Miller") has been a director of the Company since 1995.  Based on her knowledge of material, non-public information regarding the Company, Miller violated securities laws by selling more than 326,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $11.5 million.

17.     Defendant Margaret T. Monaco ("Monaco") has been  a director of the Company since 1995.  She has served on the Compensation Committee since at least 1998.  Based on her knowledge of material, non-public information regarding the Company, Monaco violated securities laws by selling more than 56,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $1.9 million.

18.     Defendant Michael N. Rosen ("Rosen") has been a director of the Company since 1986 and serves as the Board's secretary.  Based on his knowledge of material, non-public

6

information regarding the Company, Rosen violated securities laws by selling more than 56,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $1.9 million.

19.    Defendant William Sheluck, Jr. ("Sheluck") has been a director of the Company since 1993. He has served on the Board's Compensation and Audit Committees since at least 1998. Based on his knowledge of material, non-public information regarding the Company, Sheluck violated securities laws by selling more than 35,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $1.1 million.

20.    Defendant William F. Reilly ("Reilly") has been a director of the Company since January 2006.

21.    The Defendants named in ¶¶ 11 to 20 are referred to herein as the "Director Defendants."

22.    Defendant Mitchell S. Klipper ("Klipper") has served as Chief Operating Officer of Barnes & Noble, Inc. since February 2002. Based on his knowledge of material, non-public information regarding the Company, Klipper violated securities laws by selling more than 1,650,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $50 million.

23.    Defendant Marie J. Toulantis ("Toulantis") is Chief Executive Officer of Barnes & Noble.com (www.bn.com), a wholly owned subsidiary of Barnes & Noble, Inc. Toulantis first joined Barnes & Noble in 1997 as an executive vice president with responsibility for finance and was later appointed the company's chief financial officer. Toulantis became chief financial officer of Barnes & Noble.com in 1999 and was appointed president and chief operating officer of the online company in 2001. Based on her knowledge of material, non-public information regarding the

Company, Toulantis violated securities laws by selling more than 236,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $10 million.

24.     Defendant J. Alan Kahn ("Kahn") was named President of the Barnes & Noble Publishing Group in February 2002.  From 1997, he was chief operating officer of Barnes & Noble, Inc.  Kahn joined Barnes & Noble in 1978 as executive vice president and in 1988 was named president and chief operating officer of Barnes & Noble College Bookstores, Inc.  He was promoted to chief executive officer in 1995.  Based on his knowledge of material, non-public information regarding the Company, Kahn violated securities laws by selling approximately 275,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $10.5 million.

25.     Defendant William F. Duffy ("Duffy") was named Executive Vice President of Distribution and Logistics for Barnes & Noble, Inc. in February 2002.  Based on his knowledge of material, non-public information regarding the Company, Duffy violated securities laws by selling more than 222,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $9.4 million.

26.     Defendant Joseph Lombardi ("Lombardi") was named Chief Financial Officer for Barnes & Noble, Inc. in May 2003. He is responsible for financial management for the Company, including accounting and financial reporting, tax, risk management, vendor relations, merchandise planning and control, and investor relations.  Based on his knowledge of material, non-public information regarding the Company, Lombardi violated securities laws by selling more than 122,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $4.9 million.

27.     Defendant Christopher Grady- Troia ("Grady-Troia") was named Chief Information Officer for Barnes & Noble, Inc. in October 2004. He is responsible for the information technology,

8

telecommunication networks and computer systems that support the Company, as well as for allocating and evaluating the effectiveness of overall technology resources and strategies and developing new systems. Based on his knowledge of material, non-public information regarding the Company, Grady-Troia violated securities laws by selling more than 50,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $2 million.

28.    Defendant Mary Ellen Keating ("Keating") joined Barnes & Noble in 1998 as a senior vice president of corporate communications and public affairs. She is responsible, among other things, for internal and external communications, media relations, community relations, and public affairs for the Company and for Barnes & Noble/B. Dalton/Babbage's Etc. retail stores. She also coordinates public relations for Barnes & Noble College Bookstores, Inc., a privately held company, as well as the Riggio family's philanthropic programs.   Based on her knowledge of material, non-public information regarding the Company, Keating violated securities laws by selling more than 148,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $6 million.

29.    Defendant David S. Deason ("Deason") became Vice President of Barnes & Noble Development in January 1997.   Based on his knowledge of material, non-public information regarding the Company, Deason violated securities laws by selling more than 130,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $5 million.

30.    Defendant Mark Bottini ("Bottini") was named Vice President, Director of Stores, in October 2004.   Based on his knowledge of material, non-public information regarding the Company, Bottini violated securities laws by selling more than 72,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $2.9 million.

31.    Defendant Michelle Smith ("Smith") was named Vice President of Human Resources for Barnes & Noble in November 1996. She is responsible for the development, implementation and coordination of policies, practices and programs covering employee relations, compensation, benefits, organizational development and employee services. Smith joined Barnes & Noble in September 1993 as director of human resources. Based on her knowledge of material, non-public information regarding the Company, Smith violated securities laws by selling more than 24,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $929,000.

32.    Defendant Lawrence S. Zilavy ("Zilavy") joined the Company as Chief Financial Officer in June 2002 and served in that capacity until May 2003. Zilavy became Executive Vice President of Corporate Finance and Strategic Planning for the Company in May 2003. Based on his knowledge of material, non-public information regarding the Company, Zilavy violated securities laws by selling approximately 25,000 shares of Barnes & Noble stock, generating insider selling proceeds of more than $857,000..

33.    The Defendants identified in ¶¶ 22-32 are referred to as the "Officer Defendants." In addition Defendants Berdon, Monaco and Sheluck are referred to collectively as "Compensation Committee Defendants." Defendants Berdon, Del Guidice and Sheluck are referred to collectively as "Audit Committee Defendants." Defendants identified in ¶¶ 11-32 are referred to as "Insider Selling Defendants." Collectively, the Director Defendants, Officer Defendants, Compensation Committee Defendants, Audit Committee Defendants and Insider Selling Defendants are referred to herein as the "Individual Defendants." Barnes & Noble and the Individual Defendants are collectively referred to herein as "Defendants."

## DUTIES OF INDIVIDUAL DEFENDANTS

34.    The Individual Defendants, through their positions as directors and/or officers of the Company and their receipt of reports, attendance at meetings and access to all of the Company's books, records and other proprietary information, had responsibility for and therefore were in possession of material non-public information concerning the Company and its operations, finances and business prospects.

35.    By reason of their positions as officers, directors and/or fiduciaries of Barnes & Noble and because of their ability to control the business and corporate affairs of Barnes & Noble, the Individual Defendants owed Barnes & Noble and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, were and are required to use their utmost ability to control and manage Barnes & Noble in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Barnes & Noble and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.    Each director and officer of Barnes & Noble owes to Barnes & Noble the fiduciary duty to exercise due care and diligence in the administration of the affairs of Barnes & Noble and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

37.    In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations so that the market price of the Company's common stock would be based on truthful and accurate information.

38.    The Individual Defendants, because of their positions of control and authority as directors or officers of Barnes & Noble, were able to and did, directly and indirectly, control the

wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Barnes & Noble, each of the Individual Defendants had access to adverse non-public information about the operations of Barnes & Noble, including, without limitation, the fraud in which the Individual Defendants caused Barnes & Noble to engage.

39.    At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Barnes & Noble, and was at all times acting within the course and scope of said agency.

40.    To discharge their duties, the officers and directors of Barnes & Noble were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of Barnes & Noble. By virtue of such duties, the officers and directors of Barnes & Noble were required, among other things, to:

    a.    manage, conduct, supervise and direct the business affairs of Barnes & Noble in accordance with federal and state law and federal rules and regulations and the charter and bylaws of Barnes & Noble;

    b.    neither violate nor knowingly permit any officer, director, or employee of Barnes & Noble to violate applicable federal laws, rules and regulations and/or state law;

    c.    establish and maintain systematic and accurate books and records of the business and affairs of Barnes & Noble and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of said books and records;

    d.    maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Barnes & Noble's financial statements and information would be accurate;

12

e.    exercise reasonable control and supervision over the public statements to the securities markets and trading in Barnes & Noble stock by the officers and employees of Barnes & Noble;

f.    remain informed as to the status of Barnes & Noble operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws; and

g.    supervise the preparation and filing of any audits, reports or other information required by law from Barnes & Noble and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Barnes & Noble and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41.    During all relevant times hereto, each of the Individual Defendants occupied positions with Barnes & Noble or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Barnes & Noble. Because of these positions and such access, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were concealed from the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were and are obligated to disclose material adverse information regarding Barnes & Noble and to abstain from trading on such information so as to profit from its misuse.

42.    Notwithstanding their duty to refrain from trading in Barnes & Noble stock while in the possession of material, adverse, non-public information concerning the Company, Barnes & Noble insiders, with the Defendants' knowledge or approval, sold more than six (6) million shares of Barnes & Noble stock at artificially inflated prices for proceeds of more than $200 million, in direct violation of state and federal law.

13

43.     The Individual Defendants breached their duties of good faith and loyalty by allowing other Individual Defendants to cause or by themselves causing the Company to misrepresent its financial results as detailed herein, or by failing to prevent other Individual Defendants from taking such illegal actions.  As a result of the Defendants' illegal actions and course of conduct during all times relevant to this Complaint, Barnes & Noble is now the subject of lawsuits which allege violations of the federal securities laws and state laws.  As a result, the Company has expended and will continue to expend significant sums of money for internal investigations and legal fees.

## CONSPIRACY, AIDING AND ABETTING AND CONSERTED ACTION

44.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

45.     During all relevant times hereto, the Individual Defendants initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was allowing its directors and certain officers to divert hundreds of millions of dollars to Barnes & Noble insiders and directors and causing Barnes & Noble to misrepresent its financial results; (ii) maintain the Individual Defendants' executive and directorial positions at Barnes & Noble, and the profits, power and prestige which the Individual Defendants enjoyed as a result of those positions, in spite of these Defendants' violations of law and other fiduciary breaches (as set forth herein); (iii) deceive the investing public, including Plaintiff and the other shareholders of Barnes & Noble, regarding Defendants' management of Barnes & Noble's financial conditions, and Barnes & Noble's future

14

business prospects; and (iv) artificially inflate the market price of Barnes & Noble securities during all relevant times. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants, and each of them, took the actions as herein set forth.

46.     Each of the Individual Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as detailed herein, to substantially assist in the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The Individual Defendants' acts of aiding and abetting include, *inter alia*, the acts each of them is alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

47.     Each of the Individual Defendants, by acting as herein described, did so knowingly or in such an intentional manner as to constitute a breach of fiduciary duty owed to the Company and its shareholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

48.     Plaintiff brings this action derivatively in the right and for the benefit of Barnes & Noble to redress injuries suffered, and to be suffered, by Barnes & Noble as a direct result of the breaches of fiduciary duty, violations of law, abuse of control, gross mismanagement and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  This is not a collusive action to confer jurisdiction of this Court which it would not otherwise have.

49.     Plaintiff will adequately and fairly represent the interests of Barnes & Noble and its shareholders in enforcing and prosecuting its rights.

50.     Plaintiff is and was an owner of the stock of Barnes & Noble during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

51.     The present Board of Directors consists of ten members: Defendants Leonard Riggio, Stephen Riggio, Berdon, Del Giudice, Dillard, Miller, Monaco, Reilly, Rosen, and Sheluck. Plaintiff has not made any demand on the present Board of Directors of Barnes & Noble to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the reasons outlined in ¶¶ 52-62 below:

52.     Each of the directors of Barnes & Noble authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein. Because each director is interested and not independent, he or she could not fairly and fully prosecute a suit even if such suit was instituted by them.

53.     The Barnes & Noble Board of Directors and senior officers participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise the wrongs from Barnes & Noble stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein and therefore are not disinterested parties. As a result of their access to and review of internal corporate documents, communications with corporate officers and attendance at management and Board meetings, each director of Barnes & Noble had actual or constructive knowledge regarding the improper stock option grants and financial reporting.

54.     As a director of Barnes & Noble, each Board member had and has specific duties he owed to the Company and its shareholders. In breach of these specific duties, each Board member,

16

as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from Barnes & Noble's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein. Therefore, members of the Board cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action because each Board member is interested personally in the outcome of such an action, as it is his actions that have played a part in subjecting the Company to millions of dollars in liability for potential violations of applicable securities laws.

55.    In total, the Insider Selling Defendants sold 6,217,557 shares of Barnes & Noble stock, receiving $200,201,950 million in proceeds from these illegal insider sales. Because each of the Individual Defendants received a substantial personal benefit from the challenged insider sales transactions, these Defendants are interested. These Defendants face potential liability for breach of their fiduciary duties not to trade shares of Barnes & Noble stock while in possession of adverse material, non-public information. Nine of the Insider Selling Defendants, Defendants Leonard Riggio, Stephen Riggio, Miller, Dillard, Monaco, Rosen, Berdin, Sheluck and Del Guidice, are current members of the Barnes & Noble Board of Directors. Because these Defendants are interested and have breached their fiduciary duties, any demand upon them clearly would be futile.

56.    In order to bring this suit, all of the directors of Barnes & Noble would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

57.    The acts complained of constitute violations of the fiduciary duties owed by Barnes & Noble's officers and directors and these acts are incapable of ratification.

58.     Any suit by the directors of Barnes & Noble to remedy these wrongs would likely expose the Individual Defendants and Barnes & Noble to further violations of the securities laws, which would result in civil actions being filed against one or more of the Individual Defendants and thus they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

59.     Barnes & Noble has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Barnes & Noble any part of the damages the Company suffered and will suffer thereby.

60.     If the Director Defendants were to bring this derivative action against themselves, they would necessarily challenge their own misconduct, which underlies allegations against them contained in class action complaints for violations of federal securities laws, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Director Defendants.

61.     Each member of the Barnes & Noble Board is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options and other emoluments by virtue of his or her Board membership and control over the Company, the continuation of which is dependent upon his or her cooperation with the other members of the Board, and his or her participation and acquiescence in the wrongdoing set forth herein, and each member is therefore incapable of exercising independent objective judgment in deciding whether to bring this action. Because of their association as directors of the Company and their positions as present or former

18

employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment.

62.     If Barnes & Noble's current and past officers and directors are protected by directors' and officers' liability insurance against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Barnes & Noble.  Due, however, to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Barnes & Noble against these Defendants, known as, *inter alia,* the "insured versus insured exclusion."  As a result, if these Director Defendants were to sue themselves or certain of the officers of Barnes & Noble, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  In the absence of liability insurance coverage, as would occur if a similar suit were filed by the Company itself, the Director Defendant would not cause Barnes & Noble to sue themselves, since they will face a large uninsured liability.

63.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the Individual Defendants have failed and refused to seek to recover for Barnes & Noble for any of the wrongdoing alleged by Plaintiff herein.

64.     Plaintiff has not made any demand on shareholders of Barnes & Noble to institute this action since such demand would be a futile and useless act for the following reasons:

a.   Barnes & Noble is a publicly traded company with thousands of holders of record;

b.   Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.   Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could be individually identified.

## FACTUAL ALLEGATIONS

### Stock Option Grants

65.     Defendants Stephen Riggio, Klipper, Kahn, Toulantis, Deason and Leonard Riggio, among others set forth below, received grants of stock options from Barnes & Noble on unusually favorable and statistically improbable dates during at least the period of 1997 through 2005. Analysis of this seemingly fortuitous pattern of granting stock options at or near the stock's quarterly, or annual lows, just after a sharp decline in the stock's price and/or just before a substantial run-up in the stock price, coupled with the recent disclosures that the Company and the SEC are investigating the Company's stock option practices, demonstrate that this pattern could not have resulted by chance.  Instead, the only statistical explanation is that these stock options grants were, in fact, back-dated to allow the recipients to enjoy the largest possible returns at the expense of the Company and its shareholders.

66.     During the relevant period, the shareholders of Barnes & Noble had approved the Barnes & Noble, Inc. 1991 Employee Incentive Plan (the "1991 Plan"), the Barnes & Noble, Inc. 1996 Incentive Plan (the "1996 Plan") and the 2004 Incentive Plan (the "2004 Plan").  Collectively, the 1991 Plan, the 1996 Plan and the 2004 Plan are referred to as the "Stock Option Plans".  All stock options issued during the relevant period were issued pursuant to one of the Stock Option

Plans.  At all relevant times the Stock Options Plans governed the granting of stock options.

Specifically, the 1991 Plan and the 1996 Plan, stated, in pertinent part:

> The general purpose of long-term awards, currently in the form of stock options, is to align the interests of the executive officers with the interests of the Company's stockholders.  Additionally, long-term awards offer executive officers an incentive for the achievement of superior performance over time and foster the retention of key management personnel.  In determining annual stock option grants, the Incentive Plan Committee has based its decision on the individual's performance and potential to improve stockholder value. **The issuance of options at 100 percent of the fair market value also assures that executives will receive a benefit only when the stock price increases.**  (Emphasis added.)

The 2004 Plan defines "Option Price" as:

> Other than in connection with Substitute Awards, **the option price per each Share purchasable under any Option granted pursuant to this Article 5 shall not be less than 100% of the Fair Market Value of such Share on the date of grant of such Option.  Other than pursuant to Section 12.2, the Committee shall not be permitted to (a) lower the option price per Share of an Option after it is granted,** (b) cancel an Option when the option price per share exceeds the Fair Market Value of the underlying Shares in exchange for another Award (other than in connection with Substitute Awards), and © **take any other action with respect to an Option that may be treated as a repricing under the rules and regulation of the New York Stock Exchange**.  (Emphasis added.)

The 2004 Plan further defines "Fair Market Value" as:

> ...the market value of such property determined by such methods or procedures as shall be established from time to time by the Committee. **The Fair Market Value of Shares as of any date shall be the per Share closing price of the Shares as reported on the New York Stock Exchange on that date** (or if there was no reported closing price on such date, on the last preceding date on which the closing price was reported) or, if the Company is not then listed on the New York Stock Exchange, the Fair Market Value of Shares shall be determined by the Committee in its sole discretion using appropriate criteria.  (Emphasis added.)

From 1997 to 2005, the Compensation Committee granted Barnes & Noble stock options to the following directors and officers in the following amounts, purportedly on the following dates and at the corresponding exercise price:

| Officer/Director | Grant Date | Exercise Price | Number of Options |
|---|---|---|---|
| Stephen Riggio | 4/2/1997 | $17.125 | 215,300 |
| | 3/2/1998 | $34.750 | 22,949 |
| | 3/8/1999 | $26.000 | 24,900 |
| | 6/2/2004 | $21.670 | 1,415,343 |
| Mitchell S. Klipper | 4/2/1997 | $17.125 | 15,300 |
| | 3/2/1998 | $34.750 | 22,949 |
| | 3/8/1999 | $26.000 | 24,900 |
| | 3/6/2000 | $16.750 | 16,600 |
| | 3/12/2001 | $23.650 | 6,250 |
| | 2/17/2002 | $29.500 | 275,000 |
| | 2/17/2002 | $18.720 | 425,000 |
| | 2/17/2002 | $16.800 | 100,000 |
| | 3/12/2003 | $15.950 | 7,500 |
| | 4/27/2003 | $19.240 | 200,000 |
| | 6/11/2003 | $23.190 | 270,000 |
| | 6/13/2004 | $22.980 | 6,899 |
| | 3/17/2005 | $31.960 | 100,000 |
| Thomas A. Tolworthy | 4/2/1997 | $17.125 | 55,978 |
| David K. Cully | 4/2/1997 | $17.125 | 55,978 |
| J. Alan Kahn | 3/2/1998 | $34.750 | 24,945 |
| | 3/8/1999 | $26.000 | 24,900 |
| | 1/4/2000 | $19.560 | 200,000 |
| | 3/6/2000 | $16.750 | 19,920 |
| | 3/12/2001 | $23.650 | 107,500 |
| | 7/23/2002 | $18.720 | 9,350 |
| | 3/12/2003 | $15.950 | 6,250 |
| | 6/13/2004 | $22.980 | 5,059 |
| Marie J. Toulantis | 3/2/1998 | $34.750 | 14,967 |
| | 6/2/2004 | $21.670 | 707,671 |
| | 3/17/2005 | $31.960 | 50,000 |
| Maureen E. O'Connell | 3/6/2000 | $16.750 | 200,000 |
| | 3/12/2001 | $23.650 | 105,625 |
| David S. Deason | 3/6/2000 | $16.750 | 11,620 |

|  | 3/12/2001 | $23.650 | 5,000 |
|---|---|---|---|
|  | 7/23/2002 | $18.720 | 50,000 |
|  | 3/12/2003 | $15.950 | 5,250 |
| Leonard Riggio | 3/12/2001 | $23.650 | 700,000 |

67.    Additionally, while in possession of adverse non public information regarding the Company's true financial condition, the following Insider Selling Defendants participated in illegal insider trading.  The chart below illustrates the sales of the Insider Selling Defendants:

| Insider | Shares Sold | Stock Sale Proceeds |
|---|---|---|
| Mitchell S. Klipper | 1,656,424 | $50,866,689.14 |
| Stephen Riggio | 1,718,002 | $47,759,441.25 |
| Leonard Riggio | 908,711 | $26,075,349.97 |
| Irene Ruth Miller | 326,544 | $11,544,462.15 |
| Alan J. Kahn | 275,000 | $10,546,707.70 |
| Marie J. Toulantis | 236,448 | $10,066,533.75 |
| William F. Duffy | 222,986 | $9,452,854.70 |
| Mary Ellen Keating | 148,385 | $6,259,753.29 |
| David S. Deason | 130,893 | $5,184,136.97 |
| Joseph J. Lombardi | 122,337 | $4,999,112.77 |
| William T. Dillard II | 84,919 | $3,150,503.76 |
| Mark Bottini | 72,018 | $2,918,816.58 |
| Christopher Grady-Troia | 50,888 | $2,290,825.10 |
| Margaret T. Monaco | 56,613 | $1,925,643.30 |
| Michael N. Rosen | 56,613 | $1,925,118.74 |
| Matthew A. Berdon | 36,613 | $1,345,958.55 |
| William Sheluck, Jr. | 35,306 | $1,175,747.04 |
| Michelle Smith | 24,704 | $929,990.44 |
| Michael J. Del Guidice | 29,153 | $926,770.87 |
| Lawrence S. Zilavy | 25,000 | $857,534.00 |
| | **6,217,557** | **$200,201,950.07** |

68.    It is now statistically evident that individual Defendants did not comply with the requirement that stock options granted to them be priced on the date of grant.  The multi-year pattern of stock option grants on dates with highly favorable exercise prices invariably at historic stock price lows or right before a large stock price run-up demonstrates that the purported grant dates of the

stock options were not the actual dates on which the options grants were made.  Rather, the pattern indicates that grants to executives were repeatedly backdated to dates with exceedingly low stock prices.

69.     The results of a statistical study conducted by Plaintiff, which analyzed, among other factors, the stock price returns during the ten day period immediately preceding and following the purported grant date, demonstrates (as set forth below) that there is compelling evidence that backdating occurred.  These abnormal and favorable returns (set forth in further detail below) in conjunction with Barnes & Noble's recent disclosure of both an internal and SEC investigation is strong evidence of backdating and could not have occurred by chance.

| Grant Date | Exercise Price | Price 10 Days Before Grant Date | Price 10 Days After Grant Date | Percentage Increase |
|---|---|---|---|---|
| 3/2/1998 | $34.750 | $32.1250 | $37.7500 | 8.6% |
| 3/8/1999 | $26.000 | $29.6250 | $34.3750 | 32.2% |
| 1/4/2000 | $19.560 | $21.0000 | $21.9375 | 12.2% |
| 3/6/2000 | $16.750 | $17.0625 | $20.0625 | 19.8% |
| 3/12/2001 | $23.650 | $26.7900 | $24.6000 | 4.0% |
| 2/17/2002 | $29.500 | $32.0200 | $31.4100 | 6.5% |
| 7/23/2002 | $18.720 | $22.5200 | $20.0500 | 7.1% |
| 3/12/2003 | $15.950 | $17.6300 | $18.3600 | 15.1% |
| 4/27/2003 | $19.240 | $18.9000 | $20.1800 | 4.9% |
| 3/17/2005 | $31.960 | $34.6300 | $33.9400 | 6.2% |

## DEFENDANTS BACK-DATED AND OTHERWISE MANIPULATED STOCK OPTIONS

70.     The Compensation Committee was at all relevant times responsible for administering the Stock Option Plans and the stock option grants issued to the Individual Defendants under the Stock Option Plans.  The Compensation Committee Reports on Executive Compensation (the "Report") included in each year's proxy statement invariably make clear that this committee, and not some other delegate, was responsible for administering stock option compensation and for deciding

the terms of the options, including their exercise prices. For example, Barnes & Noble's proxy statement for the fiscal year ended January 29, 2000 filed May 8, 2001, states that "[t]he Company's executive officer compensation program is administered by the Compensation Committee of the Board of Directors, consisting of three non-employee directors...." The Report goes on to say that, "[t]he key elements of the Company's executive compensation package consist of base salary, annual bonus and stock options." Each Report during the relevant period contains similar statements and was signed by the members of the Compensation Committee. Additionally, in describing the Barnes & Noble Board of Directors and the committees of the Barnes & Noble Board of Directors, each year's proxy statement also states that "[t]he Compensation Committee is also responsible for determining grants of options to purchase Common Stock and for determining grants of restricted shares of Common Stock under the Barnes & Noble, Inc. 1991 Employee Incentive Plan and the Barnes & Noble, Inc. 1996 Incentive Plan...."

71.     Accordingly, the members of the Compensation Committee reviewed, approved, and had direct personal knowledge of the stock option grants to the Individual Defendants described above. But for the knowing complicity of the Director Defendants, and in particular the members of the Compensation Committee, the backdating of stock option grants to themselves and the Officer Defendants could not, and would not, have occurred. Only the abdication of their duties can explain the Director Defendants year-after-year approval of backdated stock options to executives and themselves on terms that were highly disadvantageous to the Company.

72.     The backdating of stock option grants and the issuance of these options in the amounts awarded to the Individual Defendants cause, and continue to cause, substantial harm to the Company. Backdating stock option grants represents a direct and continuing waste of valuable

corporate assets.  Barnes & Noble is the counter party to the options contracts with the Individual

Defendants, and the proceeds obtained, and yet to be obtained, by these Individual Defendants

through exercising their backdated stock options are therefore siphoned, on a dollar for dollar basis,

directly from Barnes & Noble.  In effect, the backdated grants gave the Individual Defendants an

option to purchase Barnes & Noble shares directly from the Company at an unfair and improperly

low price, with the Company making up the difference.

73.     The practice of backdating stock options also substantially harmed and continues to

harm Barnes & Noble by virtue of the fact that the practice is unlawful, deceitful, and caused the

Company to publicly misreport its financial data.  Pursuant to Accounting Principles Board ("APB")

25, the applicable GAAP provision at the time of the options grants set forth herein, if the stock's

market price on the date of grant exceeds the exercise price of the options, the corporation must

recognize the difference as an expense, which directly impacts earnings.  Barnes & Noble did not

properly expense this additional compensation to the Individual Defendants even though the

backdated stock options at issue in this action were priced below the fair market value of the

Company's stock at the date of grant and issuance.  Thus, Barnes & Noble, with the knowledge and

participation of the Individual Defendants, violated GAAP.

74.     Similarly, the option backdating likely caused Barnes & Noble to violate the Internal

Revenue Code, because compensation from exercised stock options issued under the backdating

scheme that was previously deducted, was in fact, nondeductible under Section 162(m) of the Tax

Code, 26 U.S.C. § 162(m) ("Section 162 (m)").  Pursuant to Section 162 (m) compensation in excess

of $1 million per year, including gains on stock options, paid to a corporation's five most highly-

compensated officers is tax deductible only if: (i) the compensation is payable solely on account of

the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

75.     Backdating stock options also severely undermines the already grossly excessive incentives that purportedly justify the use of stock option grants.  Stock option compensation is intended to encourage management to maximize the return to shareholders by aligning the interests of management with those of shareholders.  As set forth above and in the Report set forth in Barnes & Noble's proxy statements during the relevant period, Barnes & Noble issued stock options for the following purpose and with the following intent:

> The general purpose of long-term awards, currently in the form of stock options, is to align the interests of the executive officers with the interests of the Company's stockholders. Additionally, long-term awards offer executive officers an incentive for the achievement of superior performance over time and foster the retention of key management personnel. In determining annual stock option grants, the Incentive Plan Committee has based its decision on the individual's performance and potential to improve stockholder value. The issuance of options at 100 percent of the fair market value also assures that executives will receive a benefit only when the stock price increases.

Indeed, by permitting the Defendants to receive stock option grants backdated to correspond to low points in the stock price, the Director Defendants not only ensured that the equity-based long-term compensation was the "most rewarding element" of the Barnes & Noble executive

compensation program, but also created an attractive incentive for management to engineer dips and volatile swings in the stock price.

76.     Barnes & Noble announced on July 21, 2006 that the SEC had begun an informal inquiry into the Company's stock option practices.  The Company said it intended to fully cooperate with the SEC's investigation.  Barnes & Noble also filed a Form 8-K with the SEC that date, announcing the investigation.

77.     It is now evident that the reason for the pattern documented in the chart above is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, the Compensation Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Barnes & Noble stock was lower than the market price on the actual grant dates.

78.     Complicating matters and magnifying the harm to Barnes & Noble is the fact that during the relevant period, the Company's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.

79.     As a result of the manipulation of the stock option grant date, the Individual Defendants have been unjustly enriched by many hundreds of millions of dollars at the expense of the Company.  The Company has received and will receive far less money when the Individual Defendants exercise their options at prices substantially lower than they would have if the options had not been backdated.

### Dissemination of False and Misleading Financial Statements

80.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants:

a.     violated the terms of the Company's shareholder-approved stock option plans;

b.     violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

c.     violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

d.     produced and disseminated to Barnes & Noble's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants.

81.     The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia,* the following:

a.     Form 10-K for year ended January 28, 2006, filed with the SEC on April 5, 2006 and signed by Defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Del Guidice, Dillard, Miller, Monaco, Riley, Sheluck and Lombardi;

b.     Form 10-K for year ended January 29, 2005, filed with the SEC on April 14, 2005 and signed by Defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Del Guidice, Dillard, Miller, Monaco, Riley, Sheluck and Lombardi;

c.     Form 10-K for year ended January 31, 2004, filed with the SEC on April 15, 2004 and signed by Defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Del Guidice, Dillard, Miller, Monaco, Sheluck and Lombardi;

d.     Form 10-K for year ended February 1, 2003, filed with the SEC on April 23, 2003 and signed by Defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Del Guidice, Dillard, Miller, Monaco, Sheluck, Lombardi and Zilavy;

e.     Form 10-K for year ended February 2, 2002, filed with the SEC and May 1, 2002 and signed by defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Del Guidice, Dillard, Miller, Monaco, Sheluck, and Klipper;

f.     Form 10-K 405 for year ended January 28, 2001, filed with the SEC on December 13, 2001 and signed by Defendants Leonard Riggio, Stephen Riggio,, Berdon, Del Guidice, Dillard, Miller, Monaco, and Sheluck,;

g. Form 10-K for year ended December 31, 1999, filed with the SEC on April 28, 2000 and signed by Defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Del Guidice, Dillard, Miller, Monaco, Sheluck, and Toulantis;

h. Form 10-K 405 for the year ended February 1, 1998, filed with the SEC on May 1, 1998 Defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Dillard, Miller, Monaco, and Sheluck; and

i. Form 10-K for the year ended February 1, 1997, filed with the SEC on May 2, 1997 and signed by Defendants Leonard Riggio, Stephen Riggio, Rosen, Berdon, Dillard, Miller, Monaco, and Sheluck.

82. Furthermore, from 1997 to 2005 the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating:

a. disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants; and

b. filed with the SEC Form 4 filings that falsely reported the dates of stock option grants to Officer Defendants.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

83. The Officer Defendants breached their fiduciary duties by:

a. colluding with the Audit Committee Defendants and Compensation Committee Defendants to backdate stock option grants;

b. colluding with the Audit Committee Defendants to violate GAAP and Section 162(m);

c. colluding with the other Individual Defendants to produce and disseminate to Barnes & Noble's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d. colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

84.     The Audit Committee Defendants breached their fiduciary duties by:

    a.     colluding with the Officer Defendants and Compensation Committee Defendants to backdate stock option grants;

    b.     colluding with the Officer Defendants and Compensation Committee Defendants to violate GAAP and Section 162(m);

    c.     colluding with the other Individual Defendants to produce and disseminate to Barnes & Noble's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.     colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

85.     The Compensation Committee Defendants breached their fiduciary duties by:

    a.     colluding with the Officer Defendants and Audit Committee Defendants to backdate stock option grants;

    b.     colluding with the Officer Defendants and Audit Committee Defendants to violate GAAP and Section 162(m);

    c.     colluding with the other Individual Defendants to produce and disseminate to Barnes & Noble's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.     colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

86.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

87.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not

limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duty

88.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

89.    As alleged herein, the Individual Defendants owed and owe Barnes & Noble fiduciary duties. By reason of their fiduciary relationships, the Individual Defendants owed and owe Barnes & Noble the highest obligations of fidelity, trust, loyalty and due care. Additionally, each Individual Defendant owed and owes Barnes & Noble a duty to ensure that the Company operates in a diligent, fair, honest and equitable manner and complies with all applicable federal and state laws, rules and regulations.

90.    Each of the Individual Defendants knew, should have known, or recklessly disregarded that the Individual Defendants violated and breached their fiduciary duties of care, good faith, loyalty, reasonable inquiry, oversight and supervision.

91.    Each of the Individual Defendants had actual or constructive knowledge that he or she had caused the Company to improperly report the financial condition and business prospects of Barnes & Noble, and failed to correct the Company's publicly reported financial results. These actions could not have been in a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary duties the Company has suffered significant damages.

32

93.     As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SECOND CAUSE OF ACTION

**Violations of Section 10(b) and Rule 10b-5 of the
Securities and Exchange Act against All Defendants**

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.     Throughout the relevant period, Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to divert hundreds of millions of dollars to Defendants via improper option grants.

96.     Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Barnes & Noble not misleading.

97.     Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by Barnes & Noble.

98.     Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or

acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

99.     Each of the Defendants participated in a scheme to defraud with the purpose and effect of defrauding Barnes & Noble.

100.    By virtue of the foregoing, Defendants have violated §10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

### THIRD CAUSE OF ACTION

**Violations of Section 14(a) of the Exchange Act
against All Defendants**

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    Rule 14a-9 promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

103.    Barnes & Noble's Proxy Statements for issued during 1998-2005 violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing

Barnes & Noble to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1997.

104. In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

105. The misrepresentations and omissions in the Proxy Statements were material to Plaintiff in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

106. The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## FOURTH CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act against All Defendants

107. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108. Defendants, by virtue of their positions with Barnes & Noble and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Barnes & Noble within the meaning of § 20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Barnes & Noble to engage in the illegal conduct and practices complained of herein.

## FIFTH CAUSE OF ACTION

### Accounting

35

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    At all relevant times, Defendants, as directors and/or officers of Barnes & Noble, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

111.    In breach of their fiduciary duties owed to Barnes & Noble and its shareholders, the Defendants caused Barnes & Noble, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Barnes & Noble. By this wrongdoing, the Defendants breached their fiduciary duties owed to Barnes & Noble and its shareholders.

112.    The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Defendants.

113.    As a result of Defendants' misconduct, Barnes & Noble has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

114.    Plaintiff demands an accounting of all stock options grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

### SIXTH CAUSE OF ACTION

**Against the Insider Selling Defendants for Breach of Fiduciary Duties for
Insider Selling and Misappropriation of Information**

115.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

116.    At the time of the stock sales by the Insider Selling Defendants set forth herein, each Insider Selling Defendant knew or should have known of the illegal backdating scheme described above and sold Barnes & Noble common stock on the basis of such information.

117.    The information described above was proprietary non-public information concerning Barnes & Noble's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Defendants used for their own benefit each time they sold Barnes & Noble's common stock during the relevant period.

118.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of the Company's common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of good faith and loyalty.

119.    Because the Insider Selling Defendants' use of the Company's proprietary information for their personal gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, Barnes & Noble is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## SEVENTH CAUSE OF ACTION

### Against All Individual Defendants for Gross Mismanagement

120.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

37

121.    By their actions and/or inaction alleged herein, the Individual Defendants, directly, indirectly, knowingly, willfully and/or intentionally through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary obligations with regard to the prudent management of Barnes & Noble in a manner consistent with the operations of a public company.

122.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Barnes & Noble has sustained significant damages.

123.    As a direct and proximate result of the misconduct and breaches of fiduciary duty alleged herein, the Individual Defendants are liable to the Company.

## EIGHTH CAUSE OF ACTION

### Against All Individual Defendants for Abuse of Control

124.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

125.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Barnes & Noble, for which they are legally responsible.

126.    As a result of the Individual's abuse of control Barnes & Noble has sustained significant damages.

127.    As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## NINTH CAUSE OF ACTION

### Against All Individual Defendants for Unjust Enrichment and Waste of Corporate Assets

128.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

129.    As a result of the Individual Defendants' foregoing conduct, the Individual Defendants have caused Barnes & Noble to waste valuable assets and have subjected the Company to potential material liability for securities fraud, possibly reaching hundreds of millions of dollars in damages, as well as significant legal defense fees.

130.    As a result of the Individual Defendants' conduct described herein and as a result of the huge profits realized in illegal insider trading by the Insider Selling Defendants and the huge profits realized in bonuses and other compensation by the Individual Defendants, all of the Individual Defendants have been unjustly enriched and/or aided and abetted in the unjust enrichment of the other Individual Shareholders at the expense of Barnes & Noble and its shareholders.

131.    The Individual Defendants should be required to disgorge the gains which they will obtain or have unjustly obtained at the expense of Barnes & Noble and its shareholders.   A constructive trust for the benefit of Barnes & Noble and its shareholders should be imposed upon those proceeds.

132.    As a direct and proximate result of the Individual Defendants' unjust enrichment and waste of corporate assets Barnes & Noble has sustained significant damages.

133.    As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Declaring that the Individual Defendants, and each of them, have committed breaches of their fiduciary duties to Barnes & Noble;

39

B.     Requiring the Individual Defendants to pay Barnes & Noble the amounts by which the Company has been damaged by reason of the conduct complained herein;

C.     Requiring restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

E.     Granting extraordinary equitable and/or injunctive relief as permitted by law or equity for the Defendants' breaches of fiduciary duties; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated September 1, 2006.

Respectfully submitted,

*Ira Press*

KIRBY McINERNEY & SQUIRE, LLP
Ira. M. Press ( IP 5313)
830 Third Ave., 10th Floor
New York, NY 10022
Telephone: (212) 371-6600

CAULEY BOWMAN CARNEY & WILLIAMS, PLLC
S. Gene Cauley
J. Allen Carney
Darrin L. Williams
Marcus N. Bozeman
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
Telephone:  (501) 312-8500
Facsimile:   (501) 312-8505

Attorneys for Plaintiff

40

VERIFICATION

I, Michael L. McDonald, hereby declare as follows:

1.      I am the Chairman of the Intermountain Ironworkers Trust Fund, (Ironworkers").

2.      I have read the foregoing complaint and know the contents thereof.  Based on the research

and investigation by Cauley Bowman Carney & Williams, PLLC, Securities Counsel, for the

Ironworkers, I am informed and believe the matters therein are true and on that ground allege that

the matters stated therein are true.

3.      The Ironworkers have authorized Cauley Bowman Carney & Williams, PLLC to file this

derivative action against certain officers and directors of Barnes & Noble, Inc.

4.      I make this verification on behalf of the Ironworkers, a shareholder now and during the

relevant times of ~~Intmr~~ Barnes & Noble, Inc.

Executed this _29th_ day of August, 2006 at the Salt Lake City, Utah.

Michael L McDonald
MICHAEL L. MCDONALD